IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STAFFORD TRADING, INC. and JOHN S. STAFFORD, JR., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05 C 4868 |
| | ) | |
| FREDERICK J. LOVELY and CHARLES POKOSKI, | ) | Judge David H. Coar |
| | ) | |
| | ) | Magistrate Judge Arlander Keys |
| Defendants. | ) | |
| | ) | |
| | ) | |
| FREDERICK J. LOVELY and CHARLES POKOSKI, | ) | |
| | ) | |
| Counter-Claimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN S. STAFFORD, JR., | ) | |
| | ) | |
| Counter-Defendant. | ) | |

## JOHN S. STAFFORD, JR.'S RULE 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNT III OF THE AMENDED COUNTERCLAIM

### SUMMARY OF MOTION

In Count III of their Amended Counterclaim, defendants Frederick Lovely ("Lovely")

and Charles Pokoski ("Pokoski") allege that plaintiff John S. Stafford, Jr. ("Stafford")

misappropriated their trade secrets when he sold a computer system known as RIVAS to The

Toronto-Dominion Bank ("TD Bank"). Lovely and Pokoski contend that Stafford

"misappropriated" their alleged trade secrets in RIVAS by failing to pay them half of the

proceeds from that sale, which they allege they were due under a partnership agreement. *See*

Ex. A, Amended Counterclaim and Answer at ¶ 87. Defendants admit that they consented to the

sale of RIVAS to TD Bank, *see id.* at ¶¶ 4, 35, 45, and Stafford acknowledges in his answer that he transferred RIVAS to TD Bank with Lovely's and Pokoski's knowledge and consent. *Id.*

Even assuming all factual allegations in their favor, Lovely and Pokoski cannot succeed on their claim for misappropriation of trade secrets. Under Illinois law, disclosing a trade secret with the consent of the purported owner is *not* misappropriation. 735 ILCS 1065/2(b)(2). This is true even if the defendant has failed to pay a contractually agreed upon sum to the owner. *See, e.g., Am. Antenna Corp. v. Amperex Elec. Corp.*, 190 Ill. App. 3d 535, 546 N.E.2d 41 (Ill. App. 1989) (Ex. B, hereto) (no misappropriation where defendant acquired trade secrets pursuant to alleged agreement, even though the defendant did not pay royalties due under the agreement). It is clear on the face of the pleadings that Lovely and Pokoski consented to Stafford's sale of RIVAS to TD Bank. Defendants base their trade secret claim on an allegation that Stafford did not pay them money they were entitled to from the sale of RIVAS. Even if proved, that is not misappropriation; it is, at most, a breach of contract.

Disposing of defendants' trade secrets claim on the pleadings is not only appropriate under controlling Illinois law, it also will further the interests of judicial economy by simplifying the trial. As the Court noted at the pretrial conference, this matter involves numerous complicated issues that are likely to confuse the jury. Defendants' trade secret count in particular requires extensive factual and expert testimony. Many witnesses will have to testify on issues such as: (1) which parts of RIVAS, if any, were trade secrets and which parts were subject to copyright protection; (2) whether defendants' claimed "RIVAS methodology" was secret in the first place; (3) whether defendants took reasonable measures to maintain this secrecy; (4) whether the "RIVAS methodology" had any value because it was secret; (5) who developed the different components of RIVAS; (6) who owned each of these components; and

131838v7

(7) how much Stafford received from TD Bank for each component. It makes sense to address the legal sufficiency of Count III now, rather than doing so in a Rule 50 motion after extensive and potentially needless evidence is presented to the jury.

Finally, this motion is timely under Fed. R. Civ. P. 12(c). On September 10, 2007, this Court denied Stafford's motion to dismiss the Amended Counterclaim for failure to join TD Bank as a necessary party under Rule 19. Stafford filed his Answer to the Amended Counterclaim on September 24, 2007. He filed this motion on the same day, as soon as the pleadings were complete, and the trial is not set to begin until January 14, 2008. Accordingly, the time requirements of Rule 12(c) are fully satisfied. Fed. R. Civ. P. 12(c) (motion for judgment on the pleadings may be filed any time after pleadings are closed "but within such time as not to delay trial"); *Rizzi v. Calumet City*, 183 F.R.D. 639, 641 (N.D. Ill. 1999) (Rule 12(c) motion may not be filed until the answer is filed).

## FACTUAL ALLEGATIONS IN THE PLEADINGS

Defendants allege in their Amended Counterclaim that:

(1) they "agreed to give Stafford access to their RIVAS methodology in return for Stafford's agreement to a 50-50 partnership,"

(2) Stafford marketed and sold RIVAS to TD Bank with "Lovely's and Pokoski's consent,"

(3) Lovely and Pokoski "took the lead in presenting the RIVAS methodology to the TD Bank,"

(4) they "agreed to cooperate with the closing of the TD transaction," and

(5) under an alleged partnership agreement, Stafford was required to pay them half of the RIVAS sale proceeds.

Ex. A at ¶¶ 2, 4, 35, 37, 45.

131838v7

On the face of the Amended Counterclaim, it is clear that defendants consented to Stafford's use of their alleged trade secrets, and that they consented to the transfer of those "secrets" to TD Bank. *Id.* at ¶¶ 2, 4, 35, 45. It is also clear that defendants' misappropriation claim is premised on Stafford's failure to pay them "their one-half share" of the sale proceeds pursuant to an alleged partnership agreement. *Id.* at ¶ 87.

Defendants confirmed this in their response to Stafford's motion to dismiss the Counterclaim: "Lovely and Pokoski have never suggested that Stafford did not have authority to take their trade secrets and sell them to TD. Rather, *they gave him express authority to do so*, but conditioned on his agreement to pay them one half of the sales proceeds." Doc. 124 at 9 (emphasis added); *see also* Doc. 181 at 13, Def. Resp. to Stafford's Motion for Summary Judgment (same). In response to Stafford's motion to dismiss the Amended Counterclaim, defendants again stated that their trade secrets claim is based on Stafford's failure to pay them half the RIVAS sale proceeds under the alleged contract: "The gravamen of Count III . . . is that Lovely and Pokoski's prior trade secret rights in RIVAS were misappropriated by Stafford when he failed to compensate them for those rights at the time he transferred them to TD." Doc. 290 at 3.

Stafford denies that he breached any agreement with Lovely and Pokoski, but admits that he transferred RIVAS to TD Bank with "the full knowledge and cooperation of Lovely and Pokoski" and that "Lovely and Pokoski consented to, and participated in, the TD Transaction." *Id. See also id.* at ¶ 4 (Stafford marketed RIVAS with Lovely's and Pokoski's knowledge and consent), ¶ 37 (Lovely and Pokoski participated in presentations of RIVAS to TD), ¶ 45 (Stafford sold RIVAS with Lovely's and Pokoski's knowledge and consent).

131838v7

Thus, the act defendants allege as "misappropriation" occurred when Stafford failed to pay defendants half the sale proceeds he received from the sale of RIVAS to TD Bank. Importantly, defendants do *not* allege that the transfer of RIVAS to TD Bank was itself misappropriation. To the contrary, defendants admit they consented to the transfer. Ex. A at ¶¶ 4, 35, 45, 87.

## ARGUMENT

To state a claim for trade secret misappropriation under the Illinois Uniform Trade Secrets Act ("ITSA"), the claimant must allege: (1) a trade secret existed; (2) the secret was misappropriated; and (3) he was damaged by the misappropriation. *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 281, 827 N.E.2d 909, 925 (Ill. App. 2005). The ITSA is clear that the disclosure of a trade secret with the consent of the owner is *not* misappropriation. 735 ILCS 1065/2(b)(2) (defining misappropriation as "disclosure or use of a trade secret of a person *without express or implied consent*") (emphasis added). Illinois courts, as well as other courts applying the Uniform Trade Secrets Act, regularly dispose of trade secrets claims when the plaintiff admits that he voluntarily disclosed his trade secrets pursuant to a contract.

For example, in *American Antenna Corp. v. Amperex Electronic Corp.*, 190 Ill. App. 3d 535, 546 N.E.2d 41 (Ill. App. 1989) (Ex. B hereto), the court granted summary judgment to the defendant on a claim for trade secret misappropriation and limited the plaintiff to a breach of contract claim. *Amperex* arose when the owner of alleged trade secrets in car stereo components sued a company it allowed to manufacture those components pursuant to a license agreement. The manufacturing company was required to pay the trade secret owner a contractually agreed upon royalty, but it failed to do so. *Id.* at 536, 546 N.E.2d at 42. The trade secret owner asserted

-5-

claims for breach of contract and misappropriation of trade secrets. The defendant moved for summary judgment on the trade secrets claim.

The court first focused on the issue of consent, noting that "there is no allegation that defendant acquired the trade secrets improperly. In the plaintiff's own words, '[defendant] received plaintiff's trade secrets as part of a contractual arrangement.'" *Id.* at 539, 546 N.E.2d at 44. The court then found that the defendant's use of the trade secret was contemplated by the alleged contract, and that the breach of a contractual obligation to pay for the use negotiated, as a matter of law, does not constitute misappropriation:

> Defendant's use of the trade secrets was the use specifically contemplated by the contract. It is apparently plaintiff's position that defendant's breach of contract amounts to a breach of their confidential relationship and, thus, constitutes a misappropriation of trade secrets. We disagree. In a trade secret case, it is not the product or the process that is protected, but the secrecy of it. The alleged breach of contract here is the failure to pay royalties and fees. The failure to pay royalties and fees does not have any impact on the secrecy of the plans and designs and does not constitute a breach of confidentiality.

*Id.* (citations omitted). The court held that the plaintiff's remedy was for breach of contract: "plaintiff is complaining that it did not receive the benefit of its bargain - a harm which is appropriately remedied by bringing an action for breach of contract. A party's desire to enjoy the benefit of its bargain is not an interest that tort law traditionally protects." *Id.* at 44 (cites omitted).

Likewise, in *Contracts Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 164 F. Supp. 2d 520 (Dist. Md. 2001), the court, applying the Uniform Trade Secrets Act, granted summary judgment because the plaintiff had voluntarily revealed its trade secrets to the defendant under an alleged contract. *Id.* at 534-535. The court in *Razorback Oil Tools Int'l, Inc. v. Taylor Oil Tools Co.*, 626 So. 2d 28, 33 (La. App. 1993), also concluded that disclosure of an

-6-

alleged trade secret pursuant to a contract (even a contract that the defendant allegedly had breached) is not "misappropriation" under the Uniform Trade Secrets Act. And in *Span-Deck, Inc. v. Fabcon, Inc.*, 570 F. Supp. 81 (Dist. Minn. 1983), the court found that, to the extent the alleged trade secrets misappropriation occurred at a time when there was a contract governing the defendant's use of the trade secrets, the "plaintiff's sole remedy was for breach of contract." *Id.* at 88.

Courts that have addressed misappropriation claims concerning analogous types of intellectual property have come to the same conclusion. In *Twin City Fire Ins. Co. v. Ennen*, 2000 U.S. Dist. Lexis 6609 (E.D. Cal. April 24, 2000), the court rejected the plaintiff's contention that failure to pay contractually negotiated royalties amounted to misappropriation of an advertising idea: "while consent was conditioned on payment and payment did not occur . . . such facts do not mean that the use was extra-contractual." *Id.* at *11-12. The Ninth Circuit affirmed, holding that "misappropriation is the wrongful taking of property, not mere failure to pay a debt for property lawfully obtained." *Twin City Fire Ins. Co. v. Ennen*, 64 Fed. Appx. 47, 48-49 (9th Cir. April 22, 2000) (citations omitted). *See also Merchant v. Rhino Records, Inc.*, 1996 U.S. Dist. Lexis 1652, *7 (S.D.N.Y February 15, 1996) ("the failure to pay royalties does not give rise to an infringement action or a claim under state law for unfair competition or misappropriation of plaintiff's mark. The only claim that plaintiffs may have is one for breach of the contractual obligation to pay royalties"); *Blackmon v. Iverson*, 324 F. Supp. 2d 602, 610 (E.D. Pa. 2003) (in case for idea misappropriation "it must be the taking of the idea itself that causes the plaintiff a competitive or other financial harm . . . the loss must be independent of the defendant's failure to pay").

In this case, defendants' theory of misappropriation is that Stafford breached an alleged partnership agreement by failing to pay them half of the proceeds from the sale of RIVAS.[1] Defendants admit they disclosed their alleged trade secrets to Stafford *voluntarily* pursuant to a contract: "Lovely and Pokoski agreed to give Stafford access to their RIVAS methodology in return for Stafford's agreement to a 50-50 partnership." Ex. A at ¶ 2. Defendants also admit they consented to the sale of RIVAS to TD Bank: "Lovely and Pokoski agreed to allow Stafford to market and negotiate the sale of RIVAS on their behalf," and Stafford did so with "Lovely's and Pokoski's consent." *Id.* at ¶¶ 4, 35, 45, 87.

Because defendants admit that they consented to the disclosure of their alleged trade secrets, there is no misappropriation as a matter of law. *See* 765 ILCS 1065/2(b); *Amperex*, 190 Ill. App. 3d at 538, 546 N.E.2d at 543.

## CONCLUSION

For the reasons set forth above, Stafford respectfully requests that the Court enter judgment in his favor as to Count III of Defendants' Amended Counterclaim pursuant to Fed. R. Civ. P. 12(c).

---

[1] Without alleging a partnership, defendants could not claim the existence of a trade secret. For information to be a trade secret it must be the subject of reasonable measures to maintain confidentiality. 765 ILCS 1065/2(d). Stafford moved for summary judgment on this issue, arguing that defendants did not take "reasonable measures" because they disclosed their alleged trade secrets to dozens of Stafford employees. Defendants responded that they relied on Stafford, their alleged partner, to maintain the secrecy of their claimed trade secrets: "From the inception of the RIVAS partnership through RIVAS transfer to TD, Defendants expected Stafford to maintain and manage the confidentiality of any proprietary technology they developed." Doc. 181 at 6. The Court ruled in defendants' favor, finding that "it is illogical to conclude that Defendants failed to take reasonable steps to maintain secrecy by sharing the relevant information with Stafford's employees when they allege that Stafford was their business partner." 5/21/2007 Memorandum Opinion and Order at 13. If there was no partnership, however, defendants clearly did not use reasonable measures to protect the confidentiality of their alleged secrets.

131838v7

Dated: September 24, 2007

Respectfully submitted,

JOHN S. STAFFORD, JR.

By:     /s/ Jacob W. Harrell
        One of Their Attorneys

Gary M. Miller
Claudia M. Laurens
Sarah D. McTurnan
Jacob W. Harrell
Brooke D. Anthony
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Fax: (312) 558-1195

131838v7

## CERTIFICATE OF SERVICE

I, Jacob W. Harrell, an attorney, hereby certify that on September 24, 2007, I caused a true and correct copy of the foregoing **JOHN S. STAFFORD, JR.'S RULE 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNT III OF THE AMENDED COUNTERCLAIM** to be served upon the defendants by electronic filing notification to the following:

> Edwin L. Durham
> Kevin B. Duff
> Marion B. Adler
> Rachlis Durham Duff & Adler
> 542 South Dearborn Street
> Suite 1310
> Chicago, IL  60605
>
> Randall B. Gold
> Fox & Fox, S.C.
> 124 West Broadway
> Monona, WI  53716

/s/ Jacob W. Harrell

131838v7

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STAFFORD TRADING, INC. and JOHN S. STAFFORD, JR., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 05 C 4868 |
| FREDERICK J. LOVELY and CHARLES POKOSKI, | ) ) ) | Judge David H. Coar |
| Defendants. | ) ) ) | Magistrate Judge Arlander Keys |
| FREDERICK J. LOVELY and CHARLES POKOSKI, | ) ) ) ) | |
| Counter-Claimant, | ) ) | |
| v. | ) ) | Jury Trial Demanded |
| JOHN S. STAFFORD, JR., | ) ) ) | |
| Counter-Defendant. | ) | |

## JOHN STAFFORD, JR'S ANSWER AND
## AFFIRMATIVE DEFENSES TO AMENDED COUNTERCLAIM

Counterclaim defendant, John S. Stafford, Jr. ("Stafford"), answers the Amended

Counterclaim as follows and asserts the following affirmative defenses:

1)      Lovely and Pokoski are the creators of a groundbreaking methodology for electronic options trading known as the Realtime Integrated Volatility Arbitrage System ("RIVAS"). At the heart of the RIVAS methodology is an options pricing model based on a complex set of mathematical algorithms created and refined by Lovely and Pokoski over a three plus-year period of time through the trial and error of trading with the RIVAS methodology.

**RESPONSE:** Denied.

2)      The RIVAS methodology created by Lovely and Pokoski were valuable trade secrets that belonged solely to Lovely and Pokoski. Lovely and Pokoski agreed to give Stafford access to their RIVAS methodology in return for Stafford's agreement to a 50-50 partnership. Through this partnership, Lovely and Pokoski provided to Stafford access to RIVAS, the right to 50 percent of Lovely's and Pokoski's trading profits using RIVAS and the right to 50 percent of

the proceeds of any future licensing or sale of RIVAS. As his part of the deal, Stafford agreed to provide the capital funding and infrastructure required to refine the RIVAS methodology by Lovely and Pokoski.

**RESPONSE:** Admitted that Stafford and his employees used all aspects of RIVAS with Lovely's and Pokoski's knowledge and consent. Otherwise, denied.

3)     Although Lovely and Pokoski fully honored their side of the partnership agreement by developing the RIVAS methodology and then directing its incorporation into computer software, Stafford has only honored part of his partnership agreement obligations. Stafford honored the part of the partnership that provided for the split of trading profits (the parties split $6 million in profits generated by Lovely and Pokoski from developing and trading with RIVAS over an approximately three-year period of time), but has refused to honor his agreement to split the proceeds from a sale of RIVAS.

**RESPONSE:** Admitted that Fred Lovely ("Lovely") and Charles Pokoski ("Pokoski") received a portion of the profits from certain trading accounts as compensation for their services, but specifically denied that Stafford, Lovely, and Pokoski were ever partners. Otherwise, denied.

4)     Starting in 2001, Stafford, with Lovely's and Pokoski's consent to act on their behalf, began marketing RIVAS to various entities, including the Toronto Dominion Bank ("TD Bank"). On February 28, 2002, Stafford sold RIVAS to the TD Bank for an upfront cash payment totaling as much as $125 million, in addition to some part of $150 million in potential back-end payments along with a 25 percent share of the company created by the TD Bank to hold the RIVAS technology. Pursuant to his partnership with Lovely and Pokoski, Stafford owed half of the value received for RIVAS from the TD Bank to Lovely and Pokoski.

**RESPONSE:** Admitted that in 2001, with Lovely's and Pokoski's consent, Stafford marketed his businesses and technology, including RIVAS, to various entities, including Toronto Dominion Bank ("TD Bank"), but specifically denied that Lovely's and Pokoski's consent was required. Admitted that on February 28, 2002, with Lovely's and Pokoski's knowledge and consent, Stafford sold all his technology, including RIVAS, to TD Bank, but specifically denied that Lovely's and Pokoski's consent was required. Otherwise, denied.

5)     Instead of paying Lovely and Pokoski half of the value he received for RIVAS, Stafford falsely, fraudulently and intentionally misrepresented to Lovely and Pokoski that their 50 percent share of RIVAS had been fully paid to them through receipt of certain forgivable loans they had received from the TD Bank totaling $3.5 million. Stafford intentionally misrepresented that the amount of their forgivable loans represented Lovely's and Pokoski's 50 percent share from the sale. Stafford made these false statements to hide that Stafford was in

2

receipt of as much as $125 million for RIVAS, of which Lovely and Pokoski were entitled to one-half ($62.5 million). This Counterclaim seeks to expose this wrong and to recover for Lovely and Pokoski their share of the proceeds from the sale of RIVAS to which they are entitled.

**RESPONSE:** Denied.

6)      Lovely is a resident and citizen of the State of Illinois, currently living in Aurora, Illinois.

**RESPONSE:** Admitted.

7)      Pokoski is a resident and citizen of the State of Illinois currently living in Long Grove, Illinois.

**RESPONSE:** Admitted.

8)      Stafford is a resident and citizen of the State of Illinois.

**RESPONSE:** Admitted.

9)      This Court has original jurisdiction over this Counterclaim pursuant to 28 U.S.C. §§ 1331 and 1338 in that this action involves potential rights in computer software protected under the Copyright Act, 17 U.S.C. § 101, et seq. Additionally, this Court has supplemental jurisdiction over this Counterclaim pursuant to 28 USC § 1367, in that the claims arise from the same case or controversy as the copyright claims asserted by the plaintiffs in the principal action.

**RESPONSE:** Admitted.

10)     Venue is appropriate within this judicial district as the counter-defendants reside in this district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

**RESPONSE:** Denied that there is more than one counter-defendant.  Otherwise,

admitted.

11)     During all relevant times to this lawsuit, Stafford operated a trading company consisting primarily of various oral partnerships with traders and trading groups who traded equity options, stocks, index options, index futures, bonds, options on futures and other securities under the umbrella of one or more of three companies, each of which was either owned or controlled by Stafford. These three companies were: i) a sole proprietorship known as John S. Stafford, Jr.; ii) an Illinois limited liability company known as GPZ Trading, LLC ("GPZ"), which was primarily owned by Stafford's two sons, John S. Stafford, III ("Stafford, III") and James Stafford, but which was controlled by Stafford; and iii) another Illinois limited liability company known as JSS Investments LLC ("JSS"), which was owned and controlled by Stafford.

**RESPONSE:** Admitted that Stafford owned portions of certain companies that were engaged in the business of trading various stocks and options. Admitted that Stafford owned John S. Stafford, Jr., sole proprietorship. Admitted that until February 28, 2002, Stafford owned a majority interest in JSS, which was an Illinois limited liability company. Admitted that GPZ was an Illinois limited liability company owned primarily by Stafford's sons, Stafford III and James Stafford. Otherwise, denied.

12) The bulk of Stafford's trading partnerships were based on oral agreements made between Stafford and various traders or groups of traders. The oral partnership arrangements typically involved Stafford providing the infrastructure and some or all of the capital required for trading in return for the traders' agreement to give Stafford a certain percentage of their trading profits. Remarkably, as much as 90 percent of Stafford's agreements with traders were based only on oral conversations even though such agreements resulted in trading partnerships earning millions of dollars on an annual basis.

**RESPONSE:** Denied.

13) As was customary within the industry, traders retained ownership of the proprietary trading methods they developed or brought to such Stafford partnerships.

**RESPONSE:** Denied.

14) In addition to the trading groups, Stafford-related entities also worked on developing electronic technology to assist in trading options. Eventually, Stafford created a technology company known as "Ragnarok" to house and develop certain of these technologies.

**RESPONSE:** Admitted that some of the entities in which Stafford had an ownership interest developed electronic technology related to trading. Otherwise, denied.

15) RIVAS was developed by Lovely and Pokoski outside of the Ragnarok company.

**RESPONSE:** Denied.

16) In 1996, Lovely entered into a trading partnership with Stafford. In return for Stafford's providing the initial capital required to trade and the use of Stafford's infrastructure, Lovely agreed to give Stafford 30 percent of the option trading profits realized from his trading, as well as a percentage of the pooled profits generated by option traders who were hired and supervised by Lovely. As was customary within the industry, Lovely retained ownership of all trading methods he developed while trading in partnership with Stafford.

**RESPONSE:** Denied.

17)     In 1998, Lovely conceived the idea for a new trading methodology through which he could electronically price and trade options across a portfolio in real time. Shortly after developing the concept, Lovely offered to Stafford the opportunity to share in a 50-50 partnership for developing RIVAS. Lovely also informed Stafford that, if he were not interested in the partnership, Lovely would leave and develop the idea on his own.

**RESPONSE:** Denied.

18)     In response, Stafford told Lovely he wanted him to stay and develop the methodology in partnership with Stafford rather than with someone else. Accordingly, Stafford agreed to enter into a partnership with Lovely for the development and implementation of RIVAS. Through the partnership, Lovely agreed to give Stafford access to the RIVAS trading methodology, gave Stafford the right to 50 percent of all profits realized from trading with the RIVAS methodology and gave Stafford the right to a 50 percent equity interest in RIVAS in the event it was sold or licensed to some third party in the future in return for the capital and infrastructure (including personnel as necessary to assist with development) required to develop and trade with RIVAS.

**RESPONSE:** Denied.

19)     In January of 1997, Pokoski began working as a consultant on quantitative issues for Stafford's various entities. Shortly after reaching agreement to form the RIVAS partnership with Stafford, Lovely approached Pokoski and asked him to partner with Lovely on the project. In return for Pokoski's agreement to devote his time to working on developing and trading with the fledgling RIVAS system, Lovely agreed that he would split his half of the RIVAS partnership with Pokoski, including splitting half of Lovely's share of trading profits. Shortly after Lovely admitted Pokoski to the partnership, Lovely and Pokoski informed Stafford of the arrangement, which Stafford approved.

**RESPONSE:** Denied.

20)     During 1998, after Lovely and Pokoski had developed the basic components to the RIVAS methodology, Lovely and Pokoski began trading options using the new methodology. Shortly after trading started, Stafford confronted Lovely regarding the fact that RIVAS was costing more than he had anticipated. In response Lovely informed Stafford that, if he were uninterested in continuing to fund the project, Lovely would take over the development of the methodology on his own. Stafford insisted, however, that despite the initial costs he wanted to continue in partnership with Lovely. As the subsequent trading history proved, as Lovely and Pokoski refined the RIVAS strategies, they began to experience dramatic trading success with the new methodology.

**RESPONSE:** Denied.

21)     From the initiation of their trading in 1998 through the time of RIVAS's purported sale to the TD Bank, Lovely and Pokoski continued to develop and improve the RIVAS trading methodology through the trial and error of their day-to-day trading. For example, through this trial and error of actual trading Lovely and Pokoski refined the concepts for adjusting markets in real time, as well as the highly complex and proprietary mathematical

5

algorithms. This led directly to Lovely's and Pokoski's development of the "GUTS" options pricing model which became the cornerstone of the RIVAS system.

**RESPONSE:** Denied.

22) Shortly after they began trading with the RIVAS strategy in 1998, Lovely and Pokoski concluded that existing software could not support the calculations required by the RIVAS methodology and decided to develop their own software. Once software development began, Lovely and Pokoski collaborated on a daily basis as to the order and manner of the software development. After reaching consensus, Pokoski then directed software coders on how to take the strategies and mathematical algorithms and convert them into computer code. On a daily basis, Pokoski directed and assisted the developers on how to code the RIVAS methodology into a computer software system. Pokoski often first wrote out the computer code (in "C" or Visual Basic) to describe how he wanted to express the methodology so that the coders could convert it into the "C++" computer code language.

**RESPONSE:** Denied.

23) From the time both Lovely and Pokoski began working in connection with Stafford they were treated as consultants working in partnership with Stafford rather than employees. In fact all compensation received by both while associated with Stafford was in the form of non-employee consulting fees that were reported by Stafford to the Internal Revenue Service as Form 1099 non-employee compensation.

**RESPONSE:** Admitted that Lovely's and Pokoski's compensation was reported on IRS Forms 1099. Otherwise, denied.

24) Lovely's and Pokoski's RIVAS trading account was held by the Illinois limited liability company known as JSS Investments, LLC ("JSS"). As such, all profits received by Lovely and Pokoski from the RIVAS trading account were reported by JSS as IRS form 1099 non-employee compensation.

**RESPONSE:** Admitted that as part of their compensation Lovely and Pokoski received portions of the profits of a JSS trading account. Admitted that Lovely's and Pokoski's compensation was reported on IRS Forms 1099. Otherwise, denied.

25) In addition to the sweat equity they contributed to the partnership, Lovely and Pokoski also contributed other capital to the RIVAS partnership. For example, although Lovely was entitled to as much as 70 percent of profits from his equity options trading, Lovely agreed to a reduced 50 percent share from RIVAS trading to reflect that the development of the RIVAS would require greater capital expenditures by Stafford.

**RESPONSE:** Denied.

6

26)     Following Lovely's initial agreement with Stafford, Lovely agreed to pay Pokoski from his half of the RIVAS trading account. If Lovely had not permitted Pokoski to be paid from his half of the trading account, Stafford would have been obliged to pay Pokoski. Eventually, Pokoski split approximately $3 million in profits with Lovely from the RIVAS trading account, whereas Stafford kept the other half (approximately another $3 million).

**RESPONSE:**  Admitted that as part of their compensation Lovely and Pokoski received

portions of the profits of a JSS trading account.  Otherwise, denied.

27)     Lovely and Pokoski also allowed their profits (totaling several million at times) to be retained in the trading account to meet capital requirements for which Stafford otherwise would have been responsible.

**RESPONSE:**  Denied.

28)     As partners with Stafford, Lovely's and Pokoski's reimbursable expenses were debited as a charges against the RIVAS trading account through which Lovely, Pokoski and Stafford shared profits.

**RESPONSE:**  Denied.

29)     In 2000, Lovely and Pokoski directed the payment of $100,000 from their half of RIVAS profits as bonuses to software developers who had assisted them in the coding of the RIVAS algorithms and methodology into computer software.

**RESPONSE:**  Admitted that in 2000 money was paid to certain software developers at

Lovely's and Pokoski's request.  Admitted that software developers, not Lovely and Pokoski,

coded RIVAS.  Otherwise, denied.

30)     About the time Stafford began marketing the RIVAS methodology to third parties for eventual sale or licensing, Lovely and Pokoski agreed to allow Stafford to utilize, without charge, certain non-trade secret aspects of RIVAS, including prominently the RIVAS computer interface, so that Stafford could combine these elements of RIVAS with pre-existing Stafford software (known as "Theo Manager") to form a simplified trading model eventually known as "RIVAS Skew."

**RESPONSE:**  Denied.

31)     Starting in 2001, Stafford, with the assistance of the investment banking firm of Goldman Sachs, began marketing the sale of the technology and trading groups associated with Stafford.

132236v3

**RESPONSE:** Admitted that Goldman Sachs assisted in marketing technology owned by Stafford and entities in which Stafford or members of his family owned an interest. Otherwise, denied.

32) When it came time to present the RIVAS technology to potential buyers, Lovely and Pokoski took the lead in explaining their RIVAS trading system and the groundbreaking aspects of their methodology. For example, during 2001, Lovely and Pokoski took the lead in presenting their RIVAS methodology to Merrill Lynch and to the TD Bank. Stafford did not participate in these presentations given his lack of knowledge about the RIVAS methodology.

**RESPONSE:** Admitted that Lovely and Pokoski participated in certain presentations regarding RIVAS to Merrill Lynch, TD Bank and other potential buyers. Otherwise, denied.

33) After the initial discussions with potential buyers began, Lovely and Pokoski began to question the wisdom of selling RIVAS given the successes they were enjoying trading with the RIVAS strategy. As such, both Lovely and Pokoski approached Stafford to discuss whether they wanted to sell. Stafford represented that, if a sale were possible, he expected to be able to receive $35 to $40 million for RIVAS of which half would go to Lovely and Pokoski. Stafford also assured Lovely and Pokoski that he would make sure that they were paid their half from the proceeds after the consummation of a sale.

**RESPONSE:** Denied.

34) As it became clear to Lovely and Pokoski during 2001 that a sale of RIVAS was likely to the TD Bank (the "TD Transaction"), both re-approached Stafford on multiple occasions to see if his opinion as to the value of RIVAS had changed and to verify what their share would be. On each occasion, Stafford continued to represent the value of RIVAS to be in the $35-$40 million range and that they would split whatever amount was received by Stafford for RIVAS.

**RESPONSE:** Stafford is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 regarding Lovely's or Pokoski's mental processes regarding the likelihood of the sale to TD Bank. Otherwise, denied.

35) Relying on Stafford's various representations as to the value of RIVAS and what they would be paid, Lovely and Pokoski agreed to allow Stafford to market and negotiate the sale of RIVAS on their behalf. Lovely's and Pokoski's reliance on Stafford was reasonable based on what they knew at that time: through the time of these representations, Stafford had honored his side of the partnership deal under which the parties had been successfully operating for several years.

8

**RESPONSE:** Admitted that Stafford marketed and sold RIVAS with Lovely's and Pokoski's knowledge and consent, but specifically denied that Lovely's and Pokoski's consent was required. Otherwise, denied.

36) Shortly after negotiations between Stafford and the TD Bank began it became clear that the RIVAS trading methodology was the primary asset the TD Bank was interested in purchasing. TD Bank insisted that a condition of its purchase of RIVAS be that that Lovely and Pokoski sign on as "key" management employees with the new TD company to be formed out of the transaction which became known as TD Options, LLC ("TDO"). As an example of the importance of Lovely and Pokoski to the deal, ultimately, the TD Bank insisted that only a handful of other persons from Stafford entities sign on as "key" managers (out of potentially hundreds of Stafford employees and consultants).

**RESPONSE:** Admitted that Lovely and Pokoski were classified as key employees under the Master Purchase Agreement between the sellers and TD Bank. Admitted that the total number of such key employees was less than the total number of individuals employed by the sellers. Otherwise, denied.

37) While they took the lead in presenting the RIVAS methodology to the TD Bank, Lovely and Pokoski allowed Stafford to negotiate the monetary terms of the deal and were not privy to (or provided with) the various drafts and written communications regarding Stafford's negotiations with the TD Bank. Instead, both relied on oral communications with Stafford (as detailed above) and Jason Marks ("Marks"), a TD Bank Vice-President and the individual from the TD Bank primarily responsible for negotiating on behalf of the TD Bank.

**RESPONSE:** Admitted that Lovely and Pokoski participated in presentations of RIVAS to TD. Otherwise, denied.

38) Lovely and Pokoski were informed through Stafford, Marks and/or others working on Stafford's or Mark's behalf, that a condition of a deal with the TD Bank was that Lovely and Pokoski sign on as two of six "key" management employees of TDO. Furthermore, both were informed that their compensation from TDO would be in the form of an annual salary of $200,000 and the right to earn certain contingent back-end payments. The proposed salary was substantially lower than the sums earned by Lovely and Pokoski trading with RIVAS from 1999-2001.

**RESPONSE:** Stafford is without knowledge or information sufficient to form a belief as to the truth of any allegations regarding statements purportedly made by Jason Marks or others from TD. Otherwise, denied.

9

39) Additionally, both Lovely and Pokoski were led to believe through representations by Stafford and Marks that they would be paid for their share of RIVAS through loans that would be automatically forgiven after a three year term of employment with TDO.

**RESPONSE:** Stafford is without knowledge or information sufficient to form a belief as to the truth of any allegations regarding statements purportedly made by Jason Marks or others from TD. Otherwise, denied.

40) Around the same time that Lovely and Pokoski were learning the foregoing details, another trading firm, Citadel Investments, offered Lovely a position to head an equity derivatives group in return for $3.75 million over three years plus a split of the domestic profits as well as a one percent split of the global profits derived from the equity derivatives group.

**RESPONSE:** Stafford is without knowledge or information sufficient to form a belief as to the truth of these allegations.

41) After learning the amounts of their proposed TDO salaries, as well as the amount of the loans (eventually $2.0 million for Lovely and $1.5 million for Pokoski), both Lovely and Pokoski approached Marks to discuss their disappointment that they would be paid so little compared to what they had been earning and that the loan amounts were well below the amount they perceived RIVAS was worth.

**RESPONSE:** Stafford is without knowledge or information sufficient to form a belief as to the truth of these allegations.

42) Compounding the issue of the terms of his proposed employment with TDO for Lovely was that he had an outstanding offer to join Citadel Investments with guaranteed pay substantially above that guaranteed by TDO.

**RESPONSE:** Stafford is without knowledge or information sufficient to form a belief as to the truth of these allegations.

43) As to the salary issue, Marks assured both Lovely and Pokoski that as key managers with TDO they would have the opportunity to earn far more than they had at Stafford by trading with RIVAS. As to the amount of the loans representing the value of their share of RIVAS, Marks informed Lovely and Pokoski that they needed to take this issue up with Stafford as it related to Lovely's and Pokoski's agreement with Stafford.

**RESPONSE:** Stafford is without knowledge or information sufficient to form a belief as to the truth of these allegations.

44)     Shortly thereafter Lovely and Pokoski discussed with Stafford, the value of their loans and how they would receive funds in addition to their TD loans for RIVAS. Stafford assured Lovely and Pokoski that, if they would go along with the loans as proposed and cooperate with closing the TD Transaction, he would make sure that they were paid their one-half share for RIVAS from the proceeds he received from the TD Bank after the closing of the TD Transaction.

**RESPONSE:** Denied.

45)     In reliance on the partnership agreement that they had operated under for three years, in reliance on Stafford's assurance of the value of RIVAS, and in reliance on Stafford's assurances that he would pay them their half for RIVAS following the close of the TD Transaction, Lovely and Pokoski agreed to cooperate with the closing of the TD Transaction including: (a) signing on as key management employees with TDO at salaries far below what they had been earning; (b) in the case of Lovely, turning down the lucrative Citadel Investments deal; (c) allowing Stafford and his counsel to control the negotiation of the value of RIVAS as well as how RIVAS would be transferred to the TD Bank (including the transfer of Lovely's and Pokoski's rights in RIVAS); and (d) agreeing to accept payment for their share of RIVAS after the closing from Stafford rather than as a part of the closing from the TD Bank.

**RESPONSE:** Admitted that Stafford sold RIVAS to TD with the knowledge and

cooperation of Lovely and Pokoski. Otherwise, denied.

46)     Lovely's and Pokoski's reliance on Stafford's oral assurances was also consistent with the reliance placed on Stafford's oral assurances by other traders for whom Stafford was selling jointly-owned assets, and who also did not participate in such negotiations and likewise were not informed of all the details of the transactions.

**RESPONSE:** Denied.

47)     On February 28, 2002, Stafford consummated the TD Transaction with the TD Bank. The assets sold to the TD Bank loosely broke down into two groups.

**RESPONSE:** Admitted that the TD transaction closed on February 28, 2002.

Otherwise, denied.

48)     First, the TD Bank purchased all of the technology that had been developed under the umbrella of JSS (primarily RIVAS) and Ragnarok (which also held certain Stafford technology that had been valued at $15 million prior to closing). The TD Bank conveyed this technology to a new company referred to as TD-Ragnarok, in which Stafford retained a 25 percent interest.

**RESPONSE:** Admitted that TD Bank purchased all of the technology owned by JSS, but specifically denied that this technology was developed under the umbrella of JSS. Admitted that TD Bank purchased all of the technology owned by Ragnarok. Otherwise, denied.

49) Second, Stafford sold his on-floor trading groups, including most prominently certain partnerships Stafford had with Designated Primary Market-makers ("DPMs").

**RESPONSE:** Denied.

50) Stafford kept his profitable bond/fixed income trading group, which was transferred to a company known as Ronin Capital, LLC.

**RESPONSE:** Admitted that in 2001 certain individuals that had traded bonds or fixed income products in accounts affiliated with one or more of the selling entities began trading in affiliation with Ronin Capital, LLC. Otherwise, denied.

51) In total, under the terms of the TD Transaction, Stafford received an upfront cash payment of approximately $190 million as well as contingent back-end payments of $150 million. As much as $125 million of the upfront cash payment received by Stafford was for the sale of technology of which the primary asset was the RIVAS- trading system.

**RESPONSE:** Denied.

52) Because Stafford had purposely not included Lovely and Pokoski in the negotiations for the purchase, and did not share with them any documentation related to the sale of RIVAS, Lovely and Pokoski did not know the true amount that the TD Bank was paying for RIVAS.

**RESPONSE:** Denied.

53) Prior to the closing of the TD Transaction, Stafford was acutely aware of Lovely's and Pokoski's ownership rights to RIVAS. Stafford was also aware that neither had ever been employees of Stafford nor any company he owned or controlled and that neither had ever signed Employee Confidentiality and Non-competition Agreements with Stafford.

**RESPONSE:** Denied.


**[Paragraphs 54 through 57 omitted by counter-claimants.]**


58) One of the terms the TD Bank negotiated with Stafford for the transaction was that Stafford would represent and warrant he had obtained intellectual property rights held by

12

independent contractors (such as Lovely and Pokoski) working with Stafford so that Stafford could transfer clean title to such intellectual property to the TD Bank.

**RESPONSE:** Admitted that the sellers in the TD Transaction represented that they had title to, or had a valid and enforceable license to use, the intellectual property transferred in the transaction. Otherwise, denied.

59) Although he could not transfer clean title to RIVAS without a release or assignment from Lovely and Pokoski, unbeknownst to Lovely and Pokoski at the time, Stafford misrepresented to the TD Bank: (a) that RIVAS had been invented by Jerry Nelligan, who managed several of Stafford's developers who were responsible for computer coding; (b) that the invention was subject to patent protection (contrasted with the current claim of copyright protection); and (c) that Stafford intended to apply for a patent for RIVAS. In addition, Stafford represented that he would obtain an assignment of the RIVAS invention from Jerry Nelligan, which Stafford subsequently obtained.

**RESPONSE:** Denied.

60) Shortly before the closing of the TD Transaction, Stafford's attorneys realized that, at the very least, Pokoski was an inventor of the RIVAS model along with every other proprietary aspect of the RIVAS methodology. During this time discussions between Stafford, key Stafford management and Stafford's counsel occurred over whether Stafford should obtain Pokoski's assignment of his intellectual property rights.

**RESPONSE:** Admitted that that there was an email exchange regarding whether or not Stafford employees, including Pokoski, should be asked to sign an assignment. Otherwise, denied.

61) The question of obtaining a release or assignment from Pokoski put Stafford in a bind: if he required Pokoski to assign his intellectual property rights it would also require acknowledgement that Pokoski and Lovely were the owners of the technology because the RIVAS technology had been developed under the control of Lovely and Pokoski while working as consultants and partners.

**RESPONSE:** Denied.

62) Instead, as evidenced by the allegations by Stafford in this litigation, Stafford developed the fraudulent argument that he obtained Lovely's and Pokoski's rights to RIVAS when they signed TD Options LLC ("TDO") employment agreements. The TDO employment agreements contained a provision stating that the signer was not a party to "any non-competition or non-solicitation agreement with any Person (except as disclosed in Appendix B)."

13

**RESPONSE:** Admitted that Lovely and Pokoski both signed employment agreements with TD Options, LLC ("TDO") stating that they were not a party to "any non-compensation or non-solicitation agreement with any person (except as disclosed in Appendix B)." Appendix B identified the following "Current Non-Competition or Non-Solicitation Restrictions": (1) "Non-competition and non-solicitation provisions in the Terms of Employment of which this Appendix is a part"; (2) "Employee Confidentiality and Non-Competition Agreement with Stafford Trading"; and (3) "Employee Confidentiality and Non-Competition Agreement with Ragnarok, Inc." Otherwise, denied.

63) Appendix B to the TD Options' employment agreements listed an "Employee Confidentiality and Non-Competition Agreement with Stafford Trading" as well as two other agreements. Neither Lovely nor Pokoski had ever been employees of Stafford Trading, and neither had ever been a party to a "Employee Confidentiality and Non-Competition Agreement with Stafford Trading."

**RESPONSE:** Admitted that Appendix B to the TDO employment agreements listed the "Employee Confidentiality and Non-Competition Agreement with Stafford Trading" as one of the agreements to which both Lovely and Pokoski were parties. Otherwise, denied.

64) When presented with the TD Options employment agreement, neither Lovely nor Pokoski were informed by Stafford, or anyone acting on his behalf, that Stafford intended by reference to "Appendix B" to have Lovely and Pokoski allegedly create a retroactive release of their ownership rights in RIVAS as now argued by Stafford.

**RESPONSE:** Admitted that neither Stafford nor anyone acting on his behalf told Lovely or Pokoski that the reference to "Appendix B" in the TDO employment agreements was or was not intended to create a retroactive release. Otherwise, denied.

65) After the closing of the TD Transaction on February 28, 2002, Lovely and Pokoski waited for Stafford to pay them the additional funds he had promised to them for RIVAS. After waiting for a short time, both met with Stafford to inquire about the status of their distributions from the sale of RIVAS.

**RESPONSE:** Denied.

66) Stafford told Lovely and Pokoski that they had already received their share of the proceeds through the forgivable loans totaling $3.5 million and that this represented half of what

14

Stafford had received for RIVAS. When both Lovely and Pokoski pointed out to Stafford that this was inconsistent with his pre-closing representations, Stafford claimed that this was all the TD Bank had been willing to pay and that he could not pay them more than he had received.

**RESPONSE:** Denied.

67) Sometime during mid-2004, Lovely and Pokoski learned for the first time that RIVAS had been valued by the TD Bank for as much as $125 million rather than the $7 million that Stafford had represented to them.

**RESPONSE:** Denied.

68) During July 2005, Lovely and Pokoski met with Stafford on two occasions to confront him with what they had learned about the valuation of RIVAS and to assert their rights to one-half of the funds Stafford had received from the TD Bank for RIVAS.

**RESPONSE:** Admitted that Lovely and Pokoski met with Stafford twice in or about

July of 2005. Otherwise, denied.

69) After receiving no response from the July meetings, Lovely and Pokoski wrote a letter to Stafford on August 9, 2005 in which they reiterated their right to 50 percent of the sales proceeds for RIVAS and informed Stafford that they had "not received our share of the sale price for RIVAS, nor was the fair value of the RIVAS system accurately represented to us throughout the TD Options transaction process."

**RESPONSE:** Admitted that Lovely and Pokoski sent Stafford a letter dated August 9,

2005 that included the above quoted language. Otherwise, denied.

70) Approximately two weeks later Stafford filed suit against Lovely and Pokoski.

**RESPONSE:** Admitted that on August 23, 2005, Stafford and Stafford Trading, Inc.

filed a complaint against Lovely and Pokoski. Otherwise, denied.

# COUNT I

## BREACH OF PARTNERSHIP AGREEMENT

71) Counter-Claimants repeat and reallege Paragraphs 1 through 70 of this Counterclaim for their Paragraph 71 of Count I of the this Counterclaim.

**RESPONSE:** Stafford repeats and realleges his responses to Paragraphs 1 through 70 of

this Amended Counterclaim for his response to Paragraph 71 of the Amended Counterclaim.

71) During 1998, Pokoski, Lovely and Stafford agreed to form a partnership regarding development of the RIVAS trading system. Under the terms of the agreement, Stafford

agreed to provide infrastructure and capital in return for a 50 percent equity interest in RIVAS as well as 50 percent of the profits realized by Lovely and Pokoski while trading with the system during development. But for the formation of this partnership, Stafford would have had no right to, and no ability to gain access to, the RIVAS methodology (either in its initial form or as it was refined by Lovely and Pokoski), which was a valuable trade secret which would have been owned solely by Lovely and Pokoski.

**RESPONSE:** Denied.

72)     From 1998 through the attempted sale of RIVAS to TD Bank on February 28, 2002, the parties operated under this partnership agreement, with the parties (Lovely/Pokoski on one side and Stafford on the other side) splitting approximately $6 million in profits generated by Lovely and Pokoski from trading with their RIVAS strategy.

**RESPONSE:** Denied.

73)     In addition, Lovely and Pokoski, consistent with their partnership with Stafford, devoted capital and substantial time to the development and refinement of RIVAS into a marketable product.

**RESPONSE:** Admitted that Lovely and Pokoski were among the Stafford employees

who worked on RIVAS. Otherwise, denied.

74)     However, after Stafford completed the sale of RIVAS and other assets to TD Bank, he did not honor his agreement with Lovely and Pokoski to split the profits from the sale of RIVAS with them. Accordingly, Stafford is in breach of his agreement with Lovely and Pokoski.

**RESPONSE:** Denied.

75)     As a direct and proximate result of Stafford's breach of contract, Stafford has retained possession of approximately $62.5 million or more of the proceeds from the sale of RIVAS to the TD Bank that rightfully belong to Lovely and Pokoski. As such, Lovely and Pokoski have been damaged by Stafford's breach.

**RESPONSE:** Denied.

## COUNT II

### PROMISSORY ESTOPPEL (IN THE ALTERNATIVE)

76)     Counter-Claimants incorporate and reallege Paragraphs 1-70 of this Counterclaim for their Paragraph 76 of Count II of this Counterclaim.

**RESPONSE:** Stafford repeats and realleges his responses to Paragraphs 1 through 70 of

this Counterclaim for his response to Paragraph 76 of the Counterclaim.

16

77) From the initiation of the RIVAS partnership through the time of the sale of RIVAS to the TD Bank, through both words and conduct, Stafford repeatedly led Lovely and Pokoski to believe that, if they would develop and refine the RIVAS methodology (including any resulting software), Stafford would pay them one-half of the value received by Stafford for any ultimate sale or licensing of RIVAS. In addition, Stafford unambiguously promised Lovely and Pokoski on multiple occasions that, if they would cooperate with the closing of the TD Transaction (including agreeing to become TDO employees and accepting Key Management Loans totaling $3.5 million), he would make sure they were paid the remaining balance owed for their one-half share of RIVAS following the close of the transaction.

**RESPONSE:** Denied.

78) Lovely and Pokoski, in reliance on Stafford's promises, developed and refined the RIVAS methodology and allowed its incorporation into software. The RIVAS methodology constituted valuable trade secrets to which Stafford had no right absent an agreement with Lovely and Pokoski. Accordingly, Lovely and Pokoski relied on Stafford's promise that, if they developed and gave Stafford access to their trade secrets, Stafford would agree to split any trading profits generated from the use of the RIVAS methodology as well as pay to Lovely and Pokoski one-half of the amount received from any third party for licensing or sale of RIVAS.

**RESPONSE:** Admitted that Lovely and Pokoski were among the Stafford employees

who worked on RIVAS. Otherwise, denied.

79) Lovely and Pokoski further relied on Stafford's representations by: (a) agreeing to allow Stafford to negotiate the sale of RIVAS on their behalf; (b) agreeing to allow Stafford and his counsel to control the process by which the parties respective rights would be transferred to the TD Bank; and (c) agreeing to become TDO employees at a salary level substantially below what they had earned through trading with the RIVAS methodology; and (d) agreeing to defer their receipt of the value of one-half share of RIVAS until after the closing of the TD Transaction.

**RESPONSE:** Denied.

80) The foregoing reliance was to Lovely's and Pokoski's detriment in that both developed and then gave Stafford access to valuable trade secrets to which he would have had no right or access absent Lovely's and Pokoski's reliance on his promises. The reliance was also to Lovely's and Pokoski's detriment in that both accepted jobs with TDO at salaries either substantially below what they had been previously earning or, in the case of Lovely, substantially below what he was offered from Citadel Investments in order to assist the closing of the TD Transaction so they could receive their equity payments for one-half the value of RIVAS.

**RESPONSE:** Denied.

81) Stafford foresaw, expected and intended Lovely and Pokoski to rely on his promises.

**RESPONSE:** Denied.

82) Lovely and Pokoski relied on Stafford's promises to their detriment and as a direct and proximate result have suffered substantial damage.

**RESPONSE:** Denied.

# COUNT III

## MISAPPROPRIATION OF
## TRADE SECRETS (765 ILCS 1065/1 et seq.)

83) Counter-Claimants incorporate and reallege Paragraphs 1 through 70 of this Counterclaim as Paragraph 83 of Count III of this Counterclaim.

**RESPONSE:** Stafford repeats and realleges his responses to Paragraphs 1 through 70 of this Counterclaim for his response to Paragraph 83 of the Amended Counterclaim.

84) The trading strategies and mathematical algorithms created by Lovely and Pokoski are trade secrets subject to protection under the Illinois Trade Secrets Acts. 765 ILCS 1065/2 (d).

**RESPONSE:** Denied.

85) Pokoski and Lovely's strategies and formulas for trading are "technical . . . . data, a formula, pattern, compilation, program, device, method, technique" that is sufficiently secret to give them a competitive advantage. 765 ILCS 1065/2 (d).

**RESPONSE:** Denied.

86) Lovely and Pokoski took reasonable measures under the circumstances to maintain the secrecy of this information, including not disclosing their trading strategies and algorithms to anyone other than those with whom they were in partnership (or those working for the partnership to implement the electronic trading platform), understanding that disclosure would be made to TD Bank only with payment of monies to Lovely and Pokoski (to be shared with Stafford).

**RESPONSE:** Denied.

87) Stafford is in violation of Section 2(b) of the Illinois Trade Secret Act. The RIVAS trading methodology constitutes valuable trade secrets to which Stafford had no rights absent his partnership with Lovely and Pokoski. By denying the existence of the partnership, claiming ownership of the trade secrets by virtue of the trade secrets incorporation into software, and claiming the right to sell the trades secrets and software to the TD Bank without paying to Lovely and Pokoski their one-half share, Stafford has misappropriated Lovely's and Pokoski's trade secrets.

**RESPONSE:** Stafford admits that RIVAS was transferred to TD Bank as part of the TD Transaction, with the full knowledge and cooperation of Lovely and Pokoski. Stafford further

18

admits that Lovely and Pokoski consented to, and participated in, the TD Transaction, and benefited significantly as a result of the TD Transaction. Stafford specifically denies that he breached any agreement with Lovely and Pokoski, or that their consent was required. Otherwise, denied.

88) As a direct and proximate result of the foregoing, Lovely and Pokoski have suffered and will continue to suffer irreparable harm and loss.

**RESPONSE:** Denied.

# COUNT IV

## BREACH OF FIDUCIARY DUTY

89) Counter-Claimants incorporate and reallege Paragraphs 1-70 of this Counterclaim for their Paragraph 89 of Count IV of this Counterclaim.

**RESPONSE:** Stafford repeats and realleges his responses to Paragraphs 1 through 70 of this Counterclaim for his response to Paragraph 89 of the Amended Counterclaim.

90) Stafford owed Lovely and Pokoski fiduciary duties as their partner for the development and trading of RIVAS.

**RESPONSE:** Denied.

91) Stafford breached his fiduciary duties by falsely representing to Lovely and Pokoski the value of RIVAS, falsely representing the amount TD paid for RIVAS, and purposefully concealing the true value that he received for RIVAS from the TD Bank. Stafford also breached his fiduciary duties by pocketing Lovely's and Pokoski's half of the sales proceeds for RIVAS.

**RESPONSE:** Denied.

92) As a direct and proximate result of the foregoing breaches, Lovely and Pokoski have suffered and will continue to suffer financial loss.

**RESPONSE:** Denied.

# COUNT V

## FRAUD (In the Alternative)

93) Counter-Claimants incorporate and reallege Paragraphs 1-70 of this Counterclaim for their Paragraph 93 of Count V of this Counterclaim.

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

94)    Stafford intentionally and knowingly made the following false material statements of fact to Lovely and Pokoski including, but not limited to:

      (a)      That, if Lovely and Pokoski would contribute their RIVAS trade secrets and software to a partnership with Stafford, Stafford would pay them one-half of the value received by Stafford for RIVAS;

      (b)      That, if Lovely and Pokoski continued to work regarding the development and implementation of RIVAS – including bypassing guaranteed offers of several million dollars (to Lovely) -- they would receive 50 percent of the proceeds of the sale of RIVAS;

      (c)      That, if Lovely and Pokoski worked with Stafford in conjunction with marketing and explaining RIVAS to potential buyers such as the TD Bank, they would receive 50 percent of the proceeds of the sale of RIVAS;

      (d)      That, if Lovely and Pokoski would sign on as TDO employees at a salary rate substantially below what they had been earning so that the TD Transaction could close, Stafford would pay to Lovely and Pokoski one-half of the amount he received for RIVAS from the TD Bank;

      (e)      That, if Lovely and Pokoski would accept forgivable loans from TD well below the value of their half interest in RIVAS, Stafford would pay the balance of their half of the amount he received for RIVAS from the TD Bank to Lovely and Pokoski following the closing of the TD Transaction;

      (f)      That the forgivable loans provided by TDO were part of the proceeds they would receive for payment for their one-half interest in RIVAS;

      (g)      That, if Lovely and Pokoski would allow him to take care of all of the details associated with transferring RIVAS to the TD Bank (including procurement of legal counsel to represent them at closing), Stafford would pay to Lovely and Pokoski one-half the amount he received for RIVAS from the TD Bank;

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

95)    Stafford also intentionally concealed several material facts, including, but not limited to:

      (a)      Stafford had only hired counsel to look out after his individual interests rather than that of Stafford's, Lovely's and Pokoski's partnership or the individual interests of Lovely or Pokoski;

20

(b)     Stafford had negotiated a payment in excess of $125 million associated with sale and purchase of RIVAS rather than the $7.0 million Stafford falsely represented to Lovely and Pokoski following the closing.

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

96)     Stafford made the representations and omissions set forth in the preceding paragraphs to induce Lovely's and Pokoski's reliance thereon and to induce Lovely and Pokoski into a false sense of security about the details of the sale of the trade secrets and other assets of the partnership to the TD Bank.

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

97)     Lovely and Pokoski had a right to rely on Stafford's representations and/or omissions.

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

98)     Lovely and Pokoski relied on Stafford's false statements to their detriment.

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

# COUNT VI

## FRAUDULENT CONCEALMENT (In the Alternative)

99)     Counter-Claimants incorporate and reallege Paragraphs 1-70 of this Counterclaim for their Paragraph 99 of Count VI of this Counterclaim.

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

100)     In the alternative, even one assumes that Stafford truly believed he owned 100 percent of RIVAS, Stafford still owed Lovely and Pokoski fiduciary duties as their partner in the RIVAS trading account. As such, Stafford had a duty to inform Lovely and Pokoski of facts to their detriment, including his purported belief that he owned all of RIVAS.

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

132236v3

101)   Throughout the development of RIVAS by Lovely and Pokoski, Stafford was aware that both Lovely and Pokoski believed they were the 50 percent owners of RIVAS and that they expected Stafford to pay one-half of the proceeds from the sale of RIVAS to them.

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

102)   Despite this knowledge, Stafford fraudulently concealed from Lovely and Pokoski Stafford's purported belief that he owned all of RIVAS (despite the fact that he acknowledged their entitlement to 50 percent of the trading profits realized from use of the RIVAS methodology and software they had created). Further, Stafford actively made representations to Lovely and Pokoski to induce their continued belief that an equity partnership existed.

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

103)   Lovely and Pokoski reasonably relied to their detriment on Stafford's omission of material facts as well as his false statements of material fact by:

    (a)     Developing for Stafford's profit the RIVAS methodology; and

    (b)     Providing Stafford access to their RIVAS methodology and allowing the incorporation of this methodology into computer software;

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

104)   Lovely and Pokoski were severely damaged by their reliance on Stafford. If they had known that Stafford would attempt to deprive them of their equity partnership interest in RIVAS, they could have taken their RIVAS trading strategies elsewhere for development and trading.

**RESPONSE:** No response is necessary because the Court dismissed this count in its

Order of May 21, 2007.

## COUNT VII

### COPYRIGHT DECLARATION (In the Alternative)

105)   Counter-Claimants incorporate and reallege Paragraphs 1-70 of this Counterclaim for their Paragraph 93 of Count VII of this Counterclaim.

**RESPONSE:** Stafford repeats and realleges his responses to Paragraphs 1 through 70 of

this Amended Counterclaim for his response to Paragraph 93 of the Amended Counterclaim.

Stafford also notes that it appears counter-claimants intended to incorporate and reallege Paragraphs 1-70 of the Amended Counterclaim for their Paragraph 105 of Count VII of this Amended Counterclaim, and Stafford also repeats and realleges his responses to Paragraphs 1-70 of this Amended Counterclaim for his response to Paragraph 105 of the Amended Counterclaim.

106)    To the extent that the RIVAS software is deemed protectable under the copyright laws of the United States, the RIVAS software is an original work authored by Lovely and Pokoski while working as consultants (IRS Form 1099 independent contractors) and partners. During all relevant times, Lovely and Pokoski controlled the means and methods for the development of the RIVAS software including, but not limited to:

    (a)    solely authoring the substantive RIVAS trading methodologies;

    (b)    determining how these methodogies would be expressed through computer code; and

    (c)    controlling the means and method of the coding of their trade secrets into software.

**RESPONSE:**  Admitted that RIVAS is software protectable under the copyright laws of the United States.  Otherwise, denied.

107)    Lovely's and Pokoski's work on RIVAS was not a "work for hire" as that term is used under the United States Copyright laws.

**RESPONSE:**  Denied.

108)    [Omitted]

**RESPONSE:**  Paragraph 108 is omitted from Defendants' Amended Counterclaim.

Accordingly, Stafford does not make an answer thereto.

# COUNT VIII

## UNJUST ENRICHMENT (In the Alternative)

109)    Counter-Claimants incorporate and reallege Paragraphs 1-70 of this Counterclaim for their Paragraph 109 of Count VIII of this Counterclaim.

**RESPONSE:**  No response is necessary because the Court dismissed this count in its Order of May 21, 2007.

110)    To the extent that Stafford has a copyright claim to the RIVAS software, Stafford has been unjustly enriched through his incorporation of Lovely's and Pokoski's trade secrets into the software. The true value of the RIVAS software is derived from the RIVAS algorithms, trading methodologies and options pricing model that were incorporated into the software.

**RESPONSE:** No response is necessary because the Court dismissed this count in its Order of May 21, 2007.

111)    By taking Lovely's and Pokoski's algorithms, trading strategies and options pricing model and incorporating them into software without paying Lovely and Pokoski, Stafford has been unjustly enriched to the detriment of Lovely and Pokoski.

**RESPONSE:** No response is necessary because the Court dismissed this count in its Order of May 21, 2007.

112)    Equity and good conscience dictate that Stafford be required to disgorge the value of the RIVAS trading methodology and options pricing model to Counter-Plaintiffs.

**RESPONSE:** No response is necessary because the Court dismissed this count in its Order of May 21, 2007.

**GENERAL DENIAL**

Stafford denies that Counter-plaintiffs are entitled to any of the relief requested in their Amended Counterclaim, and denies all allegations contained in the Amended Counterclaim not otherwise, specifically admitted above.

**ADDITIONAL DEFENSES AND OTHER AFFIRMATIVE MATTER**

Stafford asserts the following defenses and other affirmative matter barring or precluding the Amended Counterclaim:

1.    The Amended Counterclaim fails to state a claim upon which relief can be granted, as set forth in Stafford's Motion to Dismiss and Motion for Summary Judgment.

2.    The Amended Counterclaim fails to state a claim for trade secret misappropriation as a matter of law.  Counter-plaintiffs admit that Stafford had their consent and authority to

24

transfer RIVAS to TD Bank. As such, Stafford could not have misappropriated the alleged trade secrets contained in RIVAS.

3.      Counter-plaintiffs have improperly and untimely amended their prayer for relief without leave of Court.

4.      Furthermore, counter-plaintiffs have admitted that they now believe that they were in a partnership, not with John Stafford, Jr., but with JSS Investments, LLC. Plaintiffs' claim against Stafford for breach of a partnership agreement must therefore be dismissed. The successor to JSS, TDO should have been joined as a necessary party.

5.      In the event that this Court finds that Lovely and Pokoski have any valid claims against Stafford under a partnership agreement, the Copyright Act or other equitable theories, those claims are barred by contractual assignment, ratification, modification, novation, accord and satisfaction, the Copyright Act, statutes of limitation, laches, waiver and estoppel, as detailed further below.

6.      As an initial matter, neither Lovely nor Pokoski contributed any copyrightable material to the software and technology that was sold to TD Bank in early 2002. Also, Lovely and Pokoski were at all relevant times employees of Stafford and any work they performed was done as "work for hire" under the Copyright Act.

7.      To the extent that this Court finds that Lovely and Pokoski contributed any relevant material to RIVAS during the course of their work and employment with Stafford, they were aware of and sanctioned Stafford's use, revision and modification of any algorithms, methods, ideas, computer code or any copyrightable or trade-secret protected material they claim to have owned, authored or created.

8. Lovely and Pokoski knew that RIVAS was used by various trading groups and in other Stafford offices from approximately 1999 continuing through the sale to TD Bank in February 2002.

9. Despite counter-plaintiffs' direct knowledge that RIVAS was being used throughout Stafford, they took no steps to protect or stop the use of this material and information, including, for instance, by obtaining confidentiality agreements or assignments from Stafford employees, consultants or traders.

10. Lovely and Pokoski did not obtain either a written agreement documenting their alleged ownership of RIVAS or a written agreement indicating that their alleged oral partnership owned or received ownership of RIVAS.

11. During the course of their employment with Stafford and related entities, in consideration for their continued employment, including receipt of salaries, bonuses, trading profits, and use of Stafford property and personnel, Lovely and Pokoski each signed and agreed to the terms of Stafford Trading Employee Confidentiality and Non-Competition Agreements ("Stafford Confidentiality Agreements"). Lovely and Pokoski also accepted and were bound by the terms of the Stafford Trading Employee Handbook.

12. Counter-plaintiffs signed and agreed to Stafford Confidentiality Agreements after they commenced employment with Stafford and at the time they received options in Ragnarok Systems, Inc. ("Ragnaraok"). It was Stafford's policy to require all employees to sign these agreements in order to continue their working relationship with Stafford and to continue receiving the benefits thereof. Lovely and Pokoski confirmed in writing that they had signed these agreements and were bound to them when they received Ragnarok options and later when they entered into employment contracts with TDO after the sale.

26

13.     The Stafford Confidentiality Agreement contains an explicit clause acknowledging that all property developed at Stafford was the sole property of Stafford Trading and assigning all rights Lovely and Pokoski had in any technology or other property developed while they worked at Stafford. The Stafford Employee Handbook also specifically prohibits use of Stafford owned property for personal or outside purposes.

14.     Lovely and Pokoski were involved in discussions and negotiations with TD regarding the sale of RIVAS and all other assets owned by Stafford Trading (and other Stafford-owned entities) during the period from 2001 through February 28, 2002. They were well aware of the fact that Stafford would be paid for, among many other things, RIVAS and other technology developed at Stafford Trading. Lovely and Pokoski each participated in and/or made presentations regarding RIVAS to TD representatives, and each had direct discussions about the sale with TD representatives such as Jason Marks and Stafford managers on numerous occasions.

15.     Counter-plaintiffs went along with and assisted in the sale of RIVAS to TD, and both profited handsomely from the transaction. Stafford also worked to ensure that, as part of the TD transaction, Lovely and Pokoski would be rewarded for their contributions. As part of the transaction, counter-plaintiffs received and accepted limited-recourse loans totaling $3.5 million from TD as well as rights to back-end payments from TD (in the form of membership in TDO) that had potential value of several million dollars. Lovely and Pokoski were provided full-time employment with TDO as Key Managers following the sale, and continued to work there for over three years following the transaction.

16.     Neither Lovely nor Pokoski made any statements regarding rights to RIVAS under any theory until mid-2005, even though as early as 1997 they had knowledge of the facts they now rely on to support their claims – including the fact that Stafford claimed full ownership in RIVAS. Counter-plaintiffs conducted themselves in a manner inconsistent with their claims

27

asserted herein by signing documents that waive and assign all interests in Stafford property, maintaining silence in the face of evidence that their rights (if any) were being disregarded or infringed, and accepting the benefits offered to them as part of the TD Transaction for years.

17.     Stafford, Jr. has been prejudiced by their silence and undue delay in asserting these claims because, *inter alia*: (a) he permitted Lovely and Pokoski to continue their employment with Stafford Trading and to have access to Stafford Trading records, systems, technology, personnel and resources, (b) he made representations and warranties of ownership in the TD Transaction based upon their words and conduct, (c) he has lost access to important records, evidence and witnesses, and (d) he has been forced to incur significant expenses in enforcing his rights to the proceeds from the sale of RIVAS.

18.     Accordingly, the counterclaim is barred by the statute of limitation as set forth in the Copyright Act, 17 U.S.C. §507(b).  For the same reasons, the counterclaim is barred by the doctrine of laches.

19.     The Amended Counterclaim is barred by the doctrine of waiver because Lovely and Pokoski engaged in conduct completely inconsistent with any claim of right in RIVAS or the proceeds thereof, and Stafford was prejudiced by their conduct.

20.     The Amended Counterclaim is barred by the doctrine of estoppel because Lovely and Pokoski engaged in conduct – including by signing written agreements both with Stafford and TD – completely inconsistent with their claims asserted herein, and Stafford reasonably relied upon their conduct to his detriment.

21.     The Amended Counterclaim is barred by Lovely's and Pokoski's express assignment of rights in RIVAS and other material developed at or by Stafford under the Stafford Confidentiality Agreement.

132236v3

22.     The Amended Counterclaim is barred by Section 201(a) of the Coypright Act, because neither Lovely nor Pokoski contributed any copyrightable material to RIVAS. Alternatively, if the Court finds that Lovely and/or Pokoski were "authors" of RIVAS under the Copyright Act, they assigned all copyrights to Stafford in the Stafford Confidentiality Agreement and granted Stafford a non-exclusive license to use RIVAS.

23.     The Amended Counterclaim is barred by Section 201(b) of the Coypright Act, which provides that an employer such as Stafford Trading is the author of all copyright material created by its employees within the scope of their employment.

24.     Alternatively, if the Court finds that there was an oral partnership, the Amended Counterclaim is barred by Section 204(a) of the Copyright Act, because Lovely and Pokoski did not obtain a written transfer of ownership in RIVAS.

25.     Alternatively, in the event that the Court finds that there was an agreement by and among Stafford and Lovely and Pokoski, the parties modified that agreement by, *inter alia*, agreeing that Lovely and Pokoski would receive $3.5 million in limited-recourse loans from TD, employment as Key Managers of TDO, and the potential to receive millions of additional dollars of consideration in the form of ownership units in TDO in exchange for any interest they had in RIVAS.

26.     Alternatively, the counter-plaintiffs ratified the substitution of obligations when they accepted $3.5 million in limited-recourse loans from TD, employment as Key Managers of TDO, and the potential to receive millions of additional dollars of consideration in the form of ownership units in TDO instead of any purported upfront cash payment from Stafford, Jr.

27.     Alternatively, in the event that the Court finds that Lovely and Pokoski notified Stafford of their claims under the alleged agreement between them prior to the closing of the TD Transaction, Stafford's obligations under such an agreement were discharged by an accord and

29

satisfaction. Lovely and Pokoski agreed to and did accept $3.5 million in limited-recourse loans from TD, employment as Key Managers of TDO, and ownership of units in TDO in lieu of receiving a cash payment from Stafford.

28.     Alternatively, there was a novation when counter-plaintiffs agreed to accept $3.5 million in limited-recourse loans from TD, employment as Key Managers of TDO, and the potential to receive millions of additional dollars of consideration in the form of ownership units in TDO.

29.     Stafford is entitled to a set-off for fees, expenses and other amounts incurred in conjunction with the marketing of RIVAS and related infrastructure, and the sale of RIVAS and related infrastructure.

30.     Counter-plaintiffs' claims are barred and/or subject to set-off because Lovely and Pokoski failed to mitigate any damages they may have incurred.

31.     Counter-plaintiffs' claims for punitive damages are barred because they have failed to allege willful and wanton conduct and because punitive damages are unavailable as a matter of law.

Dated: September 24, 2007               Respectfully submitted,

                                        JOHN S. STAFFORD, JR.

                                By:     /s/Jacob W. Harrell
                                        One of His Attorneys

John R. McCambridge
Gary M. Miller
Claudia M. Laurens
Sarah D. McTurnan
Jacob W. Harrell
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Fax: (312) 558-1195

132236v3

## CERTIFICATE OF SERVICE

I, Jacob W. Harrell, an attorney, hereby certify that on September 24, 2007, I caused a

true and correct copy of the foregoing **JOHN STAFFORD, JR'S ANSWER AND**

**AFFIRMATIVE DEFENSES TO AMENDED COUNTERCLAIM** to be served upon the

defendants by electronic filing notification to the following:

> Edwin L. Durham
> Kevin B. Duff
> Marion B. Adler
> Rachlis Durham Duff & Adler
> 542 South Dearborn Street
> Suite 1310
> Chicago, IL  60605
>
> Randall B. Gold
> Fox & Fox, S.C.
> 124 West Broadway
> Monona, WI  53716

/s/ Jacob W. Harrell _____

132236v3

# EXHIBIT B

LEXSEE 190 ILLAPP3D 535

## AMERICAN ANTENNA CORPORATION, Plaintiff-Appellant, v. AMPEREX ELECTRONIC CORPORATION, Defendant-Appellee

### No. 2-89-0131

### Appellate Court of Illinois, Second District

*190 Ill. App. 3d 535; 546 N.E.2d 41; 1989 Ill. App. LEXIS 1623; 137 Ill. Dec. 417*

### October 24, 1989, Filed

**PRIOR HISTORY:** [***1] Appeal from the Circuit Court of Kane County; the Hon. Michael F. O'Brien, Judge, presiding.

**DISPOSITION:** Order affirmed.

**COUNSEL:** Anthony S. DiVincenzo, of Campbell & DiVincenzo, of Chicago, for appellant.

Spencer J. Marks and Robert Marks, both of Marks, Marks & Kaplan, of Chicago, for appellee.

**JUDGES:** JUSTICE McLAREN delivered the opinion of the court. INGLIS and DUNN, JJ., concur.

**OPINION BY:** McLAREN

**OPINION**

[*535] [**42] Plaintiff, American Antenna Corporation (American), appeals from an order of the circuit court of Kane County granting partial summary judgment in favor of defendant, Amperex Electronic Corporation (Amperex), [*536] on counts III and IV of plaintiff's complaint. In its order, the trial court granted summary judgment on the tort claims raised in counts III and IV and limited plaintiff to breach of contract actions on those counts. On appeal, plaintiff contends that (1) a tort claim for misappropriation of trade secrets may lie even though a contract governs the relationship between the parties, and (2) monetary and punitive damages are available in a misappropriation of trade secrets case. We affirm.

The facts in this case are largely undisputed. On May 20, 1982, Amperex entered into an agreement with AudioMobile [***2] Corporation (Audio) whereby Audio would develop and design car stereo components for Amperex and would manufacture a specific quantity of

the components for sale by Amperex; Amperex would pay a specific sum for development and design and would pay a per-unit price for each component manufactured. The contract also provided that after Audio manufactured the components specified in the initial purchase order, Amperex could manufacture the components itself or could contract with a third party to manufacture the components using Audio's designs. If Amperex chose to take over the manufacturing, Audio would deliver the designs to Amperex and would assist Amperex in establishing a manufacturing process; Amperex would pay Audio a royalty of 4% of the net price of each component sold.

In September 1982 plaintiff, American Antenna Corporation (American), purchased the assets of Audio at a credit manager's sale. After discussions between the parties, it was determined that American would continue production of the components for Amperex. By this time, the component designs were completed and had been turned over to Amperex, and a certain quantity of the components had been manufactured. [***3] Amperex issued new purchase orders reflecting the negotiations between Amperex and American. The new purchase orders contained a provision that American was "not responsible for any agreement signed by AudioMobile." After American encountered problems with production deadlines, the parties agreed that Amperex would pay an "expediting charge" for an accelerated production schedule and the per-unit price of the components would be changed. New purchase orders were issued reflecting these new agreements. Plaintiff apparently completed production of the components required under the modified purchase orders. During March 1983, Amperex began manufacturing the stereo components at its own facility.

The major disputed fact in this case is whether the parties agreed that the royalty provision which was part of the contract between Amperex and Audio was also

made part of the agreement between Amperex [*537] and American. American contends that Amperex agreed to include an addendum to the November 1982 purchase orders reciting the royalty provision of the original contract; Amperex denies that it so agreed. It is undisputed that after Amperex began manufacturing the components, it [***4] did not pay American any royalties.

In July 1983 American filed suit against Amperex, alleging that American had fully performed its part of the purchase orders and that Amperex owed American $ 47,302.56. [**43] In its answer, Amperex denied that American had fully performed and denied that it owed American any money.

Amperex filed a counterclaim against American alleging, among other things, that American was using the plans and designs which resulted from the contract with Amperex to manufacture stereo components to compete with Amperex, and, therefore, American was breaching its fiduciary relationship with Amperex. Amperex sought, among other things, a declaration that Amperex had the sole proprietary right to use the designs and plans.

Thereafter, American filed its first amended complaint. Count I alleges that Amperex breached its contract with American by failing to pay royalties. Count II alleges that Amperex breached its contract by failing to pay the full amount due for development, design and manufacture of the components. Count III alleges that Amperex's right to use the plaintiff's designs arose from the May 20, 1982, agreement; that this agreement is no longer in effect, [***5] having been modified by subsequent purchase and change orders; that Amperex no longer has a legal right to use the designs; and that:

> "[B]y the sales of electronic components incorporating the particular and wholly unique trade secrets, proprietary and confidential information, technology and know-how of plaintiff, American Antenna, while purporting to be the designers and owner of the designs and trade secrets incorporated therein, defendant, Amperex, has knowingly breached the agreements with the plaintiff, misappropriated plaintiff's trade secrets, misrepresented the origin of the products and committed acts of unfair competition against the plaintiff."

Count IV alleges a violation of section 2 of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1987, ch. 121 1/2, par. 262) and a violation of section 2 of the Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1987, ch. 121 1/2, par. 312). Plaintiff sought injunctive relief and monetary damages.

Amperex filed a motion for summary judgment on count III; in the alternative, Amperex requested "partial summary judgment that the [*538] damages available under Count III * * * are limited to those damages [***6] arising out of the breach of the contracts between the parties." Amperex contended that the facts could not support causes of action for misappropriation of trade secrets, misrepresentation of the origin of the products, or unfair competition and that, at most, plaintiff had stated a cause of action for breach of contract. The parties later stipulated that the motion for summary judgment would apply to count IV as well.

In deciding the motion for summary judgment, the trial court found that, although there may be a factual dispute about whether the products involved did include trade secrets, by using the alleged secrets defendant did only what it was contractually permitted to do and did not breach a confidential relationship with the plaintiff or otherwise misappropriate or misuse plaintiff's trade secrets or confidential information; that plaintiff was limited to a cause of action for breach of contract; and that, even if a misappropriation of trade secrets action were to lie in this case, plaintiff's only remedy would be in equity for injunctive relief. The trial court denied the motion for summary judgment but granted the alternative partial summary judgment motion on the tort [***7] claims and limited plaintiff to a cause of action for breach of contract.

On appeal, plaintiff first contends that the trial court misapplied the law and the existence of an express contract between the parties does not necessarily preclude a tort claim for misappropriation of trade secrets. Based upon the undisputed facts in this particular case, we determine the tort claim is precluded by the express contract.

A trade secret is defined as "a secret *plan* or process, tool, mechanism or compound known only to its owner and those * * * to whom it is necessary to confide it." (Emphasis in original.) ( *Schulenburg v. Signatrol, Inc. (1965), 33 Ill. 2d 379, 385*.) [**44] A misappropriation of trade secrets occurs when a person acquires or discovers a trade secret by improper means or discloses or uses a trade secret in breach of a duty of confidentiality imposed on him by the nature of his relationship with the owner of the trade secret or reposed in him by the owner in disclosing the information, and the owner of the trade secret is damaged by this improper acquisition, disclosure or use. See *Schulenburg, 33 Ill. 2d 379*; *Syntex Ophthalmics, Inc. v. Novicky (F. Cir. 1984), 745 F.2d 1423*. [***8]

In this case, the parties dispute whether the designs are trade secrets and whether there was a duty of confidentiality between the parties. However, even if we accept plaintiff's position that there were trade secrets and there was a duty of confidentiality, we conclude that, [*539] as a matter of law, no misappropriation of trade secrets has occurred. First, there is no allegation that defendant acquired the trade secrets improperly. In the plaintiff's own words, "[Amperex] received plaintiff's trade secrets as part of a contractual arrangement which granted defendant the right to manufacture the stereo components."

Further, even assuming that a duty of confidentiality existed between the parties, none of defendant's acts constitute a breach of that confidentiality. Plaintiff has not alleged that defendant disclosed the trade secrets to a third party or that defendant's manner of using the trade secrets to manufacture the components was inconsistent with the terms of the contract. Defendant's use of the trade secrets was the use specifically contemplated by the contract.

It is apparently plaintiff's position that defendant's breach of contract amounts to a breach of their [***9] confidential relationship and, thus, constitutes a misappropriation of trade secrets. We disagree. In a trade secret case, it is not the product or the process that is protected, but the secrecy of it. ( *ILG Industries, Inc. v. Scott (1971), 49 Ill. 2d 88, 97.*) The alleged breach of contract here is the failure to pay royalties and fees. The failure to pay royalties and fees does not have any impact on the secrecy of the plans and designs and does not constitute a breach of confidentiality. Plaintiff has failed to establish an essential element of a trade secret case, and summary judgment was properly entered on that claim. *Taylor v. Hocker (1981), 101 Ill. App. 3d 639, 641.*

Essentially, plaintiff is complaining that it did not receive the benefit of its bargain -- a harm which is appropriately remedied by bringing an action for breach of contract. (See *Morrow v. L.A. Goldschmidt Associates, Inc. (1986), 112 Ill. 2d 87, 98.*) A party's desire to enjoy the benefit of its bargain is not an interest that tort law traditionally protects. ( *Redarowicz v. Ohlendorf (1982), 92 Ill. 2d 171, 177.*) We conclude, [***10] therefore, that the trial court was correct in limiting defendant's cause of action on counts III and IV to breach of contract.

In light of our determination that defendant has failed to establish a misappropriation of trade secrets, it is unnecessary to determine what damages might be available in such an action.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.